**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL CASE NO. 3:22-cv-00511-MR**

| | |
|---|---|
| **FAITH SHERRIE STREETER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| ) | |
| **RONALD HARRIS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for

Summary Judgment. [Doc. 35].

## I.     PROCEDURAL BACKGROUND

On September 28, 2022, Plaintiff Faith Sherrie Streeter ("Plaintiff"),

proceeding *pro se*, filed this action through an unverified Complaint pursuant

to 42 U.S.C. § 1983 for the violation of her civil rights.  [Doc. 1].  Plaintiff's

claims under the Eighth Amendment for excessive force and cruel and

unusual punishment, civil conspiracy under § 1983, and negligence passed

initial review.  [Doc. 10].  Plaintiff alleged that, on July 31, 2022, Defendant

Ronald Harris, Charles River, and Katelyn Guild used excessive force in

removing her from the shower area at Anson Correctional Institution ("Anson

CI") in Polkton, North Carolina, and conspired to deprive her of a decontamination shower after she was pepper sprayed. [Doc. 1 at 3-4]. Plaintiff alleged to have suffered injury to her left shoulder, "emotional duress," and anxiety from the alleged incident. [Id. at 8].

On November 15, 2023, Defendants filed a Motion for Summary Judgment. [Doc. 35]. Defendants argue that summary judgment should be granted because they did not violate Plaintiff's constitutional rights and because qualified immunity bars Plaintiff's claim against Defendants. [Doc. 36]. In support of their summary judgment motion, Defendants submitted a brief, their own Declarations, a Declaration of Counsel, the Incident Report, Plaintiff's disciplinary records from the incident, the North Carolina Department of Public Safety (NCDPS)[1] and Anson CI Use of Force Policies, and Plaintiff's Offender Information Sheet and prison infraction records. [Docs. 35-37, 37-1 to 37-10].

Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 38]. The Plaintiff was

---

[1] The North Carolina Department of Adult Corrections (NCDAC) has since replaced the NCDPS.

specifically advised that she "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, she must support her assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))].

In response to Defendants' motion, Plaintiff filed a Memorandum and "Opposing Statement of Facts" [Docs. 39, 40], neither of which were submitted under penalty of perjury [see id.].[2] Moreover, as noted, Plaintiff's Complaint was not verified or otherwise submitted under penalty of perjury

---

[2] Plaintiff also submitted an "Appendix" listing various exhibits, including her medical records. [Doc. 41]. Plaintiff, however, did not submit any such exhibits in opposition to Defendants' motion.

and, therefore, cannot be considered for its evidentiary value here.  See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (holding that a district court is to consider verified prisoner complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge"). Thus, in terms of evidentiary forecast, Defendants' is unrefuted.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

4

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a

'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).

## III. FACTUAL BACKGROUND

Defendant's uncontroverted forecast of evidence shows the following.

On or about October 27, 2021, apparently while incarcerated, Plaintiff was convicted of Malicious Conduct by a Prisoner in Wake County, North Carolina. She was sentenced to a term of imprisonment of three years and five months. [Doc. 37-2 at 1]. Plaintiff is scheduled to be released on February 13, 2024. [<u>Id.</u>]. Since that conviction, Plaintiff has received 52 disciplinary convictions while incarcerated, including 12 convictions for disobeying orders, seven for flooding her cell, six for assaulting or threatening to assault staff, and five for lock tampering. [Doc. 37-3].

At the relevant time, Defendant Harris was a Correctional Captain at Anson CI [Doc. 37-8 at ¶ 3: Harris Dec.], Defendant Rivers was a Correctional Sergeant [Doc. 37-9 at ¶ 3: Rivers Dec.], and Defendant Guild was a Correctional Officer [Doc. 37-10 at ¶ 3: Guild Dec.]. Defendants Harris and Rivers remain at those positions at Anson CI. [Docs. 37-8 at ¶ 3, 37-9 at ¶ 3].

On July 31, 2022, at approximately 5:00 p.m., Plaintiff flooded her cell by clogging her toilet. [Doc. 37-9 at ¶ 4]. Plaintiff was placed in restraints

6

and taken to a locking shower unit on the top mezzanine of A Pod so that staff could safely enter her cell to remove her property and clean up the water. [Id. at ¶ 5]. The shower controls in the shower unit had been broken for some time, allowing Plaintiff to turn on the water and keep it running "and add to what she had already been able to flood with her toilet." [Doc. 37-10 at ¶ 6]. Defendant Rivers told Defendant Guild that Plaintiff had flooded her cell and that he needed Defendant Guild and Officer Heh to pack up her property. [Id. at ¶ 4]. After Defendant Guild and Officer Heh packed up Plaintiff's property, they, along with Defendant Rivers, approached the shower unit to bring Plaintiff back to her cell. [Doc. 37-9 at ¶ 7]. They discovered that Plaintiff had freed herself from the handcuffs and thrown them on the pipes above her head. [Id. at ¶ 8; Doc. 37-10 at ¶ 7]. Defendants Guild and Rivers, and Officer Heh all individually directed Plaintiff to stop spitting at them, to stop using her hands in a "scoop like manner to throw water at [them]," to stop manipulating the shower head to continue the flooding, and to stand at the wicket port to be handcuffed and escorted back to her cell. [Doc. 37-10 at ¶ 8; Doc. 37-9 at ¶ 9]. Plaintiff disobeyed all orders. [Id. at ¶ 9]. Officer Heh gave her a loud and clear directive to stand at the wicket and Plaintiff replied, "fuck you bitch." [Id.]. Officer Heh administered pepper spray in a quick burst while Plaintiff was standing under

running water. [Id.]. When Plaintiff saw Officer Heh raise the canister, she covered her face with her hands. [Id. at ¶ 10]. Plaintiff then rinsed her hands and began rinsing off her face and body, decontaminating herself while in the shower. [Id.; Doc. 37-8 at ¶ 11]. Officer Heh asked Plaintiff, "are you going to comply?" Plaintiff approached the door with her hands near the wicket and said, "what does it look like you dumb bitch." The wicket was opened, and Plaintiff was restrained behind her back. [Doc. 37-10 at ¶ 10]. When Plaintiff left the shower, her clothes and body were completely wet. [Doc. 37-8 at ¶ 11]. Defendant Guild began to escort Plaintiff directly to the Hoke unit pharmacy where medical staff would evaluate her. [Doc. 37-10 at ¶ 11]. As Defendant Guild escorted Plaintiff, she heard what sounded like a "bone popping" coming from the area of Plaintiff's handcuffs. [Id. at ¶ 12]. When Defendant Guild leaned back to inspect, she saw Plaintiff contorting her hand in an attempt to escape her restraints. [Id. at ¶ 13]. Defendant Guild placed Plaintiff against the wall to maintain control to fix and properly place the restraints. [Id. at ¶ 14]. Defendant Guild then placed Plaintiff in a soft hand escort and continued to walk, directing Plaintiff to do the same. Plaintiff continued to attempt to break free from the restraints. [Id. at ¶ 15]. After having attempted to retrieve his handcuffs from the shower area, Defendant Rivers assisted Defendant Guild in escorting Plaintiff. [Id. at ¶

16].

When they entered the pharmacy, Defendants Guild and Rivers assisted Plaintiff onto the treatment bed in a sitting position while Nurse Bradley began her assessment. [Id. at ¶ 17]. Plaintiff was actively trying to slip from Defendant Guild's soft hand grip and then headbutted Defendant Guild. [Id. at ¶¶ 17, 19]. Defendant Guild lost her grip on the Plaintiff and Plaintiff was able to free her left hand from the restraints. [Id. at ¶ 20]. When Plaintiff attempted to "move forcefully off the patient bed," Defendants Guild and Rivers were able to subdue her in a partial prone position on the bed. [Id. at ¶ 21]. Another prison official who witnessed these events from a corridor outside the pharmacy went to the next unit to get Officers Tillman and Harrington to assist. [Id.]. While restrained to the bed, Plaintiff continued to actively resist. [Id. at ¶ 22]. Defendant Guild held Plaintiff's left arm behind her back and Defendant Rivers held her right, both with the appropriate force to meet Plaintiff's continued resistance. [Id. at ¶ 23; Doc. 37-9 at ¶¶ 18-19]. When Officer Tillman arrived, she was able to resecure the restraints on Plaintiff. [Doc. 37-9 at ¶ 20]. Another staff member brought a set of full restraints to the pharmacy, which included a waist chain, black box, lock, and leg restraints. [Id.]. Plaintiff was placed in full restraints and Nurse Bradley finished her examination. [Id. at ¶ 21].

Defendants Guild and Rivers and Officer Tillman began escorting Plaintiff back to A Pod. [Doc. 37-10 at ¶ 26]. Defendant Guild was holding her left arm, Defendant Rivers was holding her right arm, and Officer Tillman was directly behind her. [Id. at ¶ 27]. Plaintiff "hock[ed] her spit" multiple times, looking in Defendant Guild's direction. At one point, Plaintiff made a motion "like she was going to follow through." [Id. at ¶ 28]. Officer Tillman hollered, "Guild watch out," and Defendant Guild, while maintaining control of Plaintiff with her right arm, reached out with her left arm "to guide [Plaintiff's] face away from [Guild's] direction to prevent being spit on." [Id. at ¶ 29]. Defendant Guild was able to shield the spit away from her face [Id. at ¶ 30] and then Defendants Guild and Rivers and Officer Tillman placed Plaintiff against the wall to maintain control of her until she demonstrated that she would follow orders to stop attempting to spit on Defendant Guild and walk to her cell [Id. at ¶ 31]. Plaintiff verbally agreed to cooperate and was escorted back to her cell without further incident. [Id. at ¶ 32].

## IV. DISCUSSION

### A. Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312,

319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component – that the harm inflicted was sufficiently serious – and a subjective component – that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

This subjective standard requires proof of malicious or sadistic action by a prison official to make out an excessive force claim. This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances." Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous standard." Id. (citing Whitley, 475 U.S. at 320). "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm." Id. (internal quotations and citation omitted).

Moreover, "[c]orrectional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve internal order by compelling compliance with prison rules and procedures.'" Shiheed v. Harding, 802 Fed. App'x 765, 767 (4th Cir. 2020) (quoting Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019)). "'And we

11

owe officers wide-ranging deference in their determinations that force is required to induce compliance with policies important to institutional security.'" Id. (quoting Brooks, 924 F.3d at 112).

The forecast of evidence here plainly shows that Defendants Guild and Rivers used only that force reasonably necessary to gain control of Plaintiff and restore order. Plaintiff had just flooded her cell, disobeyed multiple orders before Officer Heh pepper sprayed her, she headbutted Defendant Guild and slipped her left handcuff, actively resisted while restrained against the bed, and threatened to and attempted to spit on Defendant Guild. Once Plaintiff finally abandoned her resistance and obeyed orders, Plaintiff was escorted to her cell without further incident or use of force. The forecast of evidence, therefore, does not support that Defendants' use of force on Plaintiff was excessive.[3] Moreover, there is no forecast of evidence that Plaintiff suffered any injury from the use of force, that Defendants were negligent in any respect, or that there was any conspiracy to deprive Plaintiff of a decontamination shower. As such, there is no genuine issue of material fact for trial in this case and Plaintiff's claims will be dismissed.

---

[3] Plaintiff did not name Officer Heh as a Defendant and does not argue that his use of pepper spray was excessive.

## B.    Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."  Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation."  E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted).  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law."  Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because Plaintiff has not presented a forecast of evidence that Defendants violated a constitutional right, Defendants are entitled to qualified immunity.  As such, summary judgment for Defendants on Plaintiff's constitutional claims would also be proper on this ground.

## V.  CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion for summary judgment.

### O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 35] is **GRANTED** and this action is hereby **DISMISSED with prejudice**.

The Clerk is instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: February 12, 2024

Martin Reidinger
Chief United States District Judge